**Frank CARACCI, Plaintiff,**
v.
**Chester A. USRY, District Director of Internal Revenue, Defendant,**
and
**United States of America, Intervenor.**
**Civ. A. No. 66–67.**

United States District Court
E. D. Louisiana,
New Orleans Division.
March 28, 1968.

Thomas J. Taylor, Anthony R. Occhipinti, New Orleans, La., for plaintiff.

Peter Winstead, Dept. of Justice, Fort Worth, Tex., for defendant.

## FINDINGS OF FACT

COMISKEY, District Judge.

This is a civil action for the refund of federal excise taxes (cabaret taxes), assessed interest, and penalties for the quarter beginning October 1, 1959, and ending December 31, 1959, in the amount of $895.43, which plaintiff contends was erroneously and illegally assessed and collected by the defendant. The United States, as intervenor, has sued for the balance of the assessment of excise taxes (cabaret taxes), assessed interest, and penalties for the period beginning July 1, 1956, and ending September 30, 1962, in the amount of $87,334.65.

The plaintiff Frank Caracci owned and operated the 500 Club, located at 441 Bourbon Street, New Orleans, Louisiana, during the period from July 1, 1956, through September 20, 1962, the time period here in issue. The 500 Club is located in the heart of the Bourbon Street entertainment district. During the period under consideration it provided entertainment to patrons primarily in the form of "strippers" or "exotic dancers". The income from the club was produced by the sale of alcoholic beverages or other refreshments to patrons, in connection with the entertainment provided. A band was utilized in connection with the performance of the "strippers", the most notable being the "Cat Girl", or Lili Christine. There is no dispute that the entertainment area of the 500 Club, for cabaret tax purposes, was a public place which furnished entertainment, other than instrumental or mechanical music alone, to patrons in the establishment. There is also no dispute that such entertainment was afforded to patrons in connection with the serving or selling of refreshments, principally, alcoholic beverages.

The 500 Club at this time consisted of two separate areas, a bar area and a lounge, entertainment or cabaret area. An iron railing approximately three feet high divided the bar area from the lounge area. At the beginning of the entertainment period a partition would be rolled down and hung on the outside of the three foot iron railing between the bar and the lounge. The partition was made of tightly woven bamboo and was covered with a green canvas. The partition extended from the ceiling to the floor, could not be seen through, and had no openings. The lounge area could not be seen from the bar area.

A patron coming into the club could either go to his left, to the lounge area, or he could go to his right, behind the partition, to the bar area. He could see the stage area upon entering the club.

This partition started a few feet after the entrance and extended about ten feet past the bar (but did not go all the way to the back of the club), covering the entire length of the bar. The three foot high iron railing extended all the way to the back of the club. At the far end of the bar (opposite from the end where a patron entered on Bourbon Street) was a separation or passageway leading to a fire exit or door going out onto St. Louis Street. Beyond this opening in the bar was a service bar which was utilized for the storage of ice and other supplies.

No customers could sit at the service bar. A break in the three foot high iron railing permitted passage between the bar and the cabaret area, but no patrons were allowed to use this passageway. Rather, only plaintiff's employees went through this opening to pass between the bar and lounge areas.

There was a rest room in the back of the lounge on the right (bar area) side of the iron railing. A patron walking to the rest room would go past the partition and could see the show on the stage if he stopped in the area between the end of the partition and the rest room. However, this area was policed by plaintiff's employees and no bar customers were allowed to remain there and view the show.

A patron could not purchase a drink at the bar and then go into the cabaret area via the front entrance or the area between the front entrance and the beginning of the partition. Anyone trying to enter the lounge in this way would be stopped by the doorman. All parties of the cabaret area would be required to purchase a drink in the cabaret or be evicted.

Lower prices were charged in the bar area, where the average cost of a drink was 75¢, than in the cabaret area where all drinks cost $2.55 each. Patrons in the bar area could not see the show and they were not permitted to purchase a drink at the bar and then go into the lounge area. The purchase of a drink at the bar did not entitle a patron of the bar to witness the entertainment.

The Government also wants to apply the cabaret tax to income derived by plaintiff which was recorded in the books and records of the 500 Club as "other income" or "concessions". Plaintiff stated that this income was produced by an "escort service", which he claims afforded visiting businessmen the opportunity of having a lady escort show them the city and the various places of entertainment in the area. The Government argues that this income is part of the operations of the 500 Club cabaret while plaintiff contends that it is an operation completely independent of the Club.

## CONCLUSIONS OF LAW

The cabaret excise tax which was assessed is based upon 26 U.S.C. § 4231 (6), which provides as follows:

"There is hereby imposed:

"(6) *Cabarets.*—A tax equivalent to 20 percent of all amounts paid for admission, refreshment, service, or merchandise, at any roof garden, cabaret, or other similar place furnishing a public performance for profit, by or for any patron or guest who is entitled to be present during any portion of such performance. * * * "

Section 4232 contains the definitions of terms used in section 4231 and provides:

"(b) *Roof garden, cabaret or other similar place.*—The term 'roof garden, cabaret, or other similar place,' as used in this chapter, shall include any room in any hotel, restaurant, hall, or other public place where music and dancing privileges or any other entertainment, except instrumental or mechanical music alone, are afforded the patrons in connection with the serving or selling of food, refreshment, or merchandise. In no case shall such term include any ballroom, dance hall, or other similar place where the serving or selling of food, refreshment, or merchandise, is merely incidental, unless such place would be considered, without the application of the preceding sentence, as a 'roof garden, cabaret, or other similar place.' "

In determining whether a cabaret tax was correctly assessed against the business done in the bar area, it is helpful to review some cases which are relevant to this situation.

In Jones v. District Director of Internal Revenue, 241 F.Supp. 531 (E.D.Mo., 1965) the plaintiff operated two businesses, a night club and a store selling package liquor. Both operations were located in the same building. The two concerns were separated by a solid wall and each had its own outside entrance. The court found that there was no tax due on the package liquor store because each establishment was a distinct and

separate operation and they were actually physically separated by the wall.

In Sitnick v. United States, 244 F. Supp. 656 (D.Md., 1965) there was a lounge subject to the cabaret tax and a bar which the Government asserted was also covered by the excise tax statute. Each room had its own entrance, but the two establishments were connected by an eighteen foot long hallway. However, an iron gate barrier in the hallway stopped patrons from going from one room to the other. The court held that the bar was not subject to the cabaret tax because of the physical obstacle between the two rooms.

In McKenzie v. Maloney, 71 F.Supp. 691 (D.Or., 1946) plaintiff operated a dancing room and a room in which refreshments and merchandise were sold. The rooms were separate but were connected by a door. This door remained closed while entertainment and dancing were going on except when persons passed from one room to the other. During these short intervals one or two people in certain positions in the room were able, with effort, to obtain fleeting glances at one or two couples dancing past the door inside the entertainment room, but they could not see the orchestra or any of the entertainment. The only people who were allowed to go into the entertainment room were those who paid entrance charges. The court held that no cabaret tax was due on the room in which refreshments and merchandise were sold.

Daum v. Jarecki, 123 F.Supp. 583 (N.D.Ill., 1952) was a similar case. There the landlord operated a recreation or dance hall and the tenants operated a cocktail lounge and dining room adjacent to this recreation hall. One of the rooms operated by the tenants, called the Pine Room, was connected to the dance hall by a door. During the period of dancing (on Saturday nights) the door connecting the Pine Room and the dance hall was open, but patrons of the Pine Room could not go into the dance hall without buying a ticket for 75¢. Patrons in certain positions in the Pine Room could catch a fleeting glance through the open door at one or two couples dancing, and they could hear some music on rare occasions when a juke box located in the Pine Room was not playing and when there was no noise due to the conversations of the customers in the Pine Room. The court held that no tax was due on the business done in the Pine Room because the patrons therein were not entitled to be present in the dance hall.

In Argyrides v. Glotzbach, 6 AFTR 2d 6202, 60–2 USTC ¶ 15,312 (E.D.Va., 1960) the MCA Grill consisted of two areas. One area, the bar area, contained a bar, eighteen bar stools, one table and several vending machines. It seated about twenty people. The other area, the dance area, was a larger room containing a number of booths, tables and chairs and a juke box. This area had a seating capacity of about sixty people. The two operations were separated by a solid wall partition about four feet high, with wood lattice work extending from the top of the partition to the ceiling. Rectangular openings in the lattice work construction made it possible to see from one area into the other. There was also an opening in the partition about the size of a doorway, which remained uncovered at all times. The establishment had only one outside entrance which led into the bar area. The only means of access into the dance area was through the open doorway in the partition between the bar and dance areas. No admission was charged for entry into the dance area, but on all nights when dancing was permitted, the price for food and drink in the dance area was higher than that charged in the bar area. Patrons of the bar area were allowed to enter the dance area and use its facilities but were not permitted to carry food or drink from the bar area into the dance area. The court held that both the dance area and the bar area were subject to the cabaret tax.

In re Duffin, 141 F.Supp. 869 (S.D. Cal., 1956) involved a similar situation. There was a bar area and a dance area divided by a lattice-work partition, but

this partition could be seen through. Furthermore, the partition was open at either end so that a patron could pass from one area to the other. Patrons in the bar could witness the dancing and could and did participate in the dancing. Between 8:00 P.M. and 2:00 A.M. the establishment maintained or furnished a public performance for profit at which all patrons of the place were entitled to be present whether they were all seated in the bar area or the dance area. In this case, like in Argyrides v. Glotzbach, supra, it was held that both areas were subject to the cabaret excise tax.

Kern v. United States, 264 F.Supp. 952 (W.D.Wis., 1966) was concerned with the 400 Club, which was operated by plaintiff from the late 1930's until 1958. In 1948 and earlier the 400 Club consisted of two large rooms, a bar room and a dance room. The only entrance to the building was through the bar room. There were service windows in the partition between the bar room and the dance room. Patrons could pass between the two rooms through an opening in the partition. Food and beverages were served to customers in the dance room through the service windows, and patrons of the premises could pass without inhibition from dance room to bar room and from bar room to dance room. In 1948 the Internal Revenue Service told plaintiff that cabaret taxes were due on both the bar room and the dance room because patrons of the bar room were permitted to witness the entertainment and to go into the cabaret room to dance. This assessment was evidently not challenged by the plaintiff. In 1948 the club was remodeled. Now the entrance to the club opened into a hallway which in turn allowed a patron to enter either the bar room or the cabaret or dance room. The service windows in the wall between the two rooms were walled up so that there was a solid floor to ceiling wall, and the doorway between these rooms (which remained only to conform with fire regulations) was locked so that patrons of the bar room could never witness the dancing or entertainment in the cabaret room, nor could the patrons of the bar room pass directly to the cabaret room. A charge was made at the door to the cabaret room for admission, and a patron of the bar room could not enter the cabaret room without paying this admission charge. The court held that no excise tax was due on business done in the bar room during the period after 1948. The court held that no excise tax was due on the business done in the bar room during the period subsequent to 1948.

Perhaps the case most pertinent to the facts now before the Court is Martin v. United States, 8 AFTR 2d 6148 (D. Minn., 1961). In this case there was a bar room and a cabaret room in which there was entertainment and dancing. There was a door connecting the two rooms, and this door was made of heavy plastic material which could not be seen through. On either side of the doorway were glass windows with frosted ornamental designs on them. Persons in the bar room could not see the entertainment or dancing in the cabaret room through the frosted glass windows unless they were to stand with their faces pressed against the glass with their necks or bodies contorted so that they could see through the parts of the windows not covered by the frosted design. When the door was open, patrons standing or sitting in the part of the bar room available to them could see with difficulty but could not hear what was happening in the cabaret room. The part of the bar nearest to the door of the cabaret room had no stools for customers but was used as a service bar area. Bar room customers were not allowed to stand in the service bar area. Plaintiff kept the door closed during entertainment periods. The court held that there was no excise tax due on the business done in the bar room and said:

"The patrons of plaintiff's separate bar room were not entitled to witness or enjoy cabaret room entertainment, nor were they able to witness or enjoy cabaret room entertainment due to the physical layout of plaintiff's prem-

ises. The term 'witness or enjoy' does not include observation or audiences obtained by patrons willing to endure substantial discomfort and impediments, especially created for the purpose of preventing enjoyment."

Another interesting case is United States v. Hover, 268 F.2d 657 (9th Cir., 1959) which involved Ciro's in Los Angeles. The Pavillion Room was adjacent to the lounge which in turn was next to, and not separated from, the Main Room in which there was entertainment. The Pavillion Room was separated from the lounge by a movable wall and a thick soundproof curtain. The Pavillion Room was used primarily for private organizations which would reserve the room for the evening for the exclusive use of their members. These parties usually began at 7:00 p. m. and were usually over by 10:00 p. m. On some occasions the movable wall would be moved back at 10:30 p. m. when the floor show began in the Main Room. Prior to the start of the floor show the private organization would have paid the tab for the dinner, and the waiters would have departed. Anything served thereafter was subject to the cabaret tax. The Pavillion Room had its own separate entrance, although it was possible to enter or leave through the lounge. The Ninth Circuit held that no tax was due on business done in the Pavillion Room as long as the wall was not moved back for the floor show.

All of the above cases deal with the part of 26 U.S.C. § 4231(6) which states that the tax is imposed on the business derived from patrons who are "entitled to be present" during the entertainment. In interpreting this statutory requirement, the courts have concentrated on two factors: (1) whether the patrons of the non-cabaret area are permitted to witness the entertainment, and (2) whether patrons are allowed to go into the cabaret area without paying some type of admission cost. In Argyrides v. Glotzbach and In re Duffin, in which the courts taxed the non-cabaret areas, the patrons of the non-cabaret area were permitted both to view the entertainment in the cabaret area and to enter the entertainment area without paying any additional cost. In none of the cases decided in favor of the taxpayer were the patrons of the non-cabaret area allowed to either view the entertainment or to freely enter the cabaret area. The Court is of the opinion that great attention should be given to these two factors in determining whether the patrons of the bar area of the 500 Club were "entitled to be present" during the period of the stage show.

In the case before us the patrons of the bar area were prohibited from seeing the entertainment by the partition which was lowered at the beginning of the show. It is true that the area was not completely sealed off, as there was a space between the entrance and the partition ended before reaching the back of the club, thus leaving an opening. Also, the break in the iron railing near the back of the Club offered a possible passageway to the lounge for a bar customer. However, the plaintiff has offered evidence that his employees effectively policed these areas so that no bar customers were permitted to enter the cabaret unless they purchased drinks in the cabaret for $2.55 each.

The evidence in this case convinces the Court that the bar patrons could not see the show from the bar and were not permitted to stand in the area between the end of the partition and the rest room for the purpose of viewing the performance. We are also of the opinion, based on an examination of the facts in this case, that no patron of the bar was allowed to enter the cabaret area without purchasing a $2.55 drink. Thus, this case satisfies both requirements laid down by the jurisprudence in construing 26 U.S.C. § 4231(6): the patrons of the bar could neither see the entertainment nor freely enter the cabaret area. Under a reasonable interpretation of the statute, therefore, the bar area clearly is not subject to the federal cabaret excise tax.

The Government, however, strongly relies on Treasury Regulations 43 (1941 ed.), Section 101.14(c), which provides:

"(c) Amounts paid for refreshment, service, or merchandise in a room which is entirely separate from the room in which entertainment is furnished are not subject to tax, provided that the patrons in such separate room may not witness the entertainment *and any door in the wall or partition separating the two rooms remains closed during the period of the entertainment except when patrons pass from one room to the other.*" (Emphasis added)

It seems clear to the Court that the bar area in this case should be taxed under the Regulation. However, under a reasonable interpretation of the statute the bar area should not be taxed. What weight, then, should be given to this regulation?

■ It is settled that Treasury Regulations must be sustained unless they are unreasonable and plainly inconsistent with the revenue statutes, and they should not be overruled except for weighty reasons. Commissioner of Internal Revenue v. South Texas Lumber Co., 333 U.S. 496, 68 S.Ct. 695, 92 L.Ed. 831 (1948). However, while Treasury Regulations ordinarily have the force of law, courts will not enforce regulations which are unreasonable and plainly inconsistent with the Revenue Statutes. Estate of Willet v. Commissioner of Internal Revenue, 365 F.2d 760 (5th Cir., 1966).

■ The Court is reluctant to declare this Treasury Regulation invalid. Nevertheless, we feel that the redactors of Section 101.14(c) did not have in mind a situation like that existing in the 500 Club. It is true that the bar area in the 500 Club is not physically sealed off from the cabaret area, but for the purpose of prohibiting the bar patrons from seeing the entertainment and from entering the cabaret area, this partition, aided by the policing by plaintiff's employees, serves that function as effectively as if the bar were situated in a separate room. For this reason we do not consider this case to be governed by the letter of this regulation.

The Government also contends that the bar area should be taxed because there is an economic or operational interdependence between the bar and the cabaret. This theory of taxation is based on Revenue Ruling 56–526, 1956, 1956–2 CB 825, in which there was a dining room and a ballroom separated by a solid wall. Each room had a separate outside entrance. Patrons of the dining room could not witness the entertainment in the ballroom. They could not enter the ballroom unless they went outside, paid an admission price, and entered the ballroom by its separate outside entrance. The Internal Revenue Commissioner ruled that despite the fact that the two rooms were separate, the test in this case was whether there was one interdependent operation or two separate operations:

"The basic question to be resolved is whether the operation of the room in which food, refreshment, or merchandise is sold is so independent of the operation of the entertainment room that they can be regarded as two separate operations, or whether they are so interdependent that they must be regarded as one operation. This question must be resolved on the basis of the facts and circumstances in each case."

The Commissioner said that a significant circumstance to be considered is the amount of any charge for admission to the entertainment room. Where a "bona fide admission charge" must be paid before entering the entertainment room, there are two separate operations and no tax is due on the non-cabaret room. According to the ruling,

"the term 'bona fide admission charge' means a charge equivalent to that which would be made if the room in which the entertainment is provided were operated without or entirely independent of, the room in which the food and refreshments are sold. In

688

determining the bona fides of an admission charge, a comparison may be made, in the light of local trade practices and conditions, with other separately operated dance halls or ballrooms, giving due consideration to the entertainment and facilities offered and the type of patronage attracted."

If there is no admission charge or if a person entering the entertainment room pays less than a bona fide admission charge, this entertainment room "presumably is maintained only to attract patrons to the room in which the food or refreshments are sold. This circumstance tends to establish the interdependent relationship of the rooms as an entertainment room and a related room, respectively, and, therefore, together they constitute a single operation." However, the Commissioner made an exception to this rule by saying that the cabaret tax does not apply to amounts paid for food or refreshments in the non-cabaret room by persons "who cannot witness therefrom the entertainment in the entertainment room and who do not avail themselves of the privilege of entering the entertainment room to participate in or witness the entertainment."

■ In summary, this ruling says that the non-cabaret area is not taxable if (1) there is a "bona fide admission charge", or, (2) even if there is no such admission charge, as long as patrons of the non-cabaret room can neither witness the entertainment nor enter the entertainment room. In view of this second exception to the "interrelated operations" theory, it is clear that the 500 Club is not taxable under Revenue Ruling 56–526. For as we have stated earlier in this opinion, patrons of the bar area could neither see the entertainment nor pass freely into the cabaret area.

■ The Government also takes the position that the plaintiff's income from the escort service is subject to the cabaret tax. Although it is true that there is a rebuttable presumption in favor of the correctness of the Commissioner's assessment, plaintiff has overcome this presumption with testimony that the escort service was separate from and not in any way connected with the 500 Club. On the other hand, the Government has come up with no evidence to connect the escort service with the operation of the 500 Club. This escort service, therefore, is not subject to the cabaret tax.

For the foregoing reasons, it is ordered and decreed that the plaintiff recover from defendant the sum of $895.43, with 6% per annum interest thereon from and after date of payment, until paid.

It is further ordered and decreed that the United States of America, Intervenor, take nothing by its counterclaim.

The Clerk will prepare a judgment.